```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                  GREENVILLE DIVISION

 3   CHRISTINE CLARK,
                                        CIVIL ACTION NO.
 4             Plaintiff,        6:14-cv-04313-BHH-JDA

 5   VS.

 6   BRIAN K. BRIDGES, et al.,

 7             Defendant.

 8


 9   DEPOSITION OF:   ROBERT WILKIE

10   DATE:           July 31, 2015

11   TIME:           1:30 p.m.

12   LOCATION:       Chapman, Harter & Harter P.A.
                     14 Lavinia Avenue
13                   Greenville, SC

14   TAKEN BY:       Counsel for Plaintiff

15   REPORTED BY:    KENNETH McCLURE,
                     Registered Merit Reporter
16
     _____
17
             A. WILLIAM ROBERTS, JR. & ASSOCIATES
18
                  Fast, Accurate & Friendly
19

20   Charleston, SC    Hilton Head, SC    Myrtle Beach, SC
     (843) 722-8414    (843) 785-3263      (843) 839-3376
21
      Columbia, SC     Greenville, SC      Charlotte, NC
22   (803) 731-5224    (864) 234-7030      (704) 573-3919

23

24

25
```

| Clark, Christine v<br>Bridges, Brian K., et al | Robert Wilkie<br>July 31, 2015 |
|---|---|

Page 18

1  A.  Affidavit.
2  Q.  Okay, affidavit.  Anything else?
3  A.  Judge's signature.
4  Q.  Judge's signature.  Anything else?
5  A.  I'm not sure exactly what you're asking.
6  Q.  As you understand it, does the judge's
7  warrant need to tell you what it is that you need to
8  seize?
9  A.  You would need a description of the
10 property sought.
11  Q.  And if the description of the property,
12 say, were blank, would you understand that warrant
13 to be valid or not?
14  A.  If it was blank?
15  Q.  Uh-huh.
16  A.  No.
17  Q.  No, it wouldn't be valid, as far as you
18 understand it?
19  A.  I wouldn't think so.  Like I said, I'm not
20 an attorney or a magistrate.
21  Q.  What is your understanding as to when law
22 enforcement may arrest someone at their home without
23 an arrest warrant?
24  A.  When probable cause exists for the arrest.
25 If there are exigent circumstances.

Page 19

1  Q.  Anything else?
2  A.  If the crime occurred in the presence of
3  the officer.
4  Q.  Anything else?
5  A.  No.
6     MR. HARTER:  Object to the form.
7     You can answer.
8  Q.  When you say "exigent circumstances," what
9  do you mean?
10  A.  If there was a possibility that the suspect
11 could flee or destroy evidence.
12  Q.  Anything else?
13     MR. HARTER:  Object to the form.
14     You can answer.
15  A.  No.
16  Q.  As you understand it, does it matter
17 whether the crime is a felony or misdemeanor?
18  A.  It could.
19  Q.  In what way?
20  A.  It would be my understanding that, if it
21 was a felony -- it would be my understanding, if it
22 was a felony or a misdemeanor, and the crime
23 occurred in the presence of the officer, then that
24 officer could make an arrest without an arrest
25 warrant.

Page 20

1  Q.  So it doesn't matter whether it is a felony
2  or a misdemeanor, right?
3  A.  Not necessarily.
4  Q.  Does it matter as to your ability to arrest
5  someone whether someone is at their home or out on
6  the street, or does the location not matter?
7  A.  It could.
8  Q.  In what way?
9  A.  If someone was in their home and they
10 wouldn't come out of the home, you would possibly
11 have to have a search warrant to enter the home.
12  Q.  Any other way?
13     MR. HARTER:  Object to form.
14     You can answer.
15  A.  No.
16  Q.  I would now like to direct your attention
17 to the investigation in August 2011 into some stolen
18 tools and a lawnmower.  Were you part of that
19 investigation?
20  A.  Yes.
21  Q.  How did you come to be a part of that
22 investigation?
23  A.  I was called by Justin Moody.  He presented
24 some facts and information to me in an attempt for
25 me to present these facts to a magistrate to get a

Page 21

1  search warrant for a residence.
2  Q.  Were you present at the home of Mr. Smith,
3  who was the fellow that was trying to, I guess, flee
4  from law enforcement on a stolen four-wheeler?
5  A.  I think I went to that location briefly.
6  And if I remember correctly, I had to -- for
7  whatever reason, I had to leave shortly after I
8  arrived.
9  Q.  I'm sorry?
10  A.  I was just saying, I had to leave shortly
11 after I arrived and go back to Laurens, to our
12 office.
13  Q.  So did you have any communications with
14 Mr. Smith that you can recall?
15  A.  No.
16  Q.  Do you recall why you had to go back to
17 Laurens?
18  A.  No.
19  Q.  After you went back to Laurens, did there
20 come a time when you went to Miss Clark's home on
21 Hilley Drive?
22  A.  Yes.
23  Q.  Did you go there before you got the search
24 warrant or after you got the search warrant?
25  A.  After.



Clark, Christine v  
Bridges, Brian K., et al

Robert Wilkie  
July 31, 2015

Page 22

1  Q.  So you're back in your office when Mr.
2  Moody gives you a call.  Right?
3  A.  I was in Laurens, correct.
4  Q.  You were in Laurens when Mr. Moody gives
5  you a call.  What does he tell you on the phone?
6  A.  He received information that a stolen --
7  I'm going to call it "a mower," for lack of better
8  terms, was supposedly located at this particular
9  address on Hilley Drive.
10      Mr. Moody and other officers went to that
11  location.  It's my understanding, when walking
12  around to the rear of the residence in an attempt to
13  locate someone at home, they observed this machine
14  in plain view at the residence.
15      He called, wanting me to present this
16  information to a magistrate to see if we could get a
17  search warrant for the residence, because it was his
18  understanding from the Abbeville investigators
19  during the theft of this machine that other items
20  were stolen.
21  Q.  And did he tell you what those other items
22  might have been?
23  A.  There were some tools, loose, I guess, like
24  hand tools.  It seems like there was an air
25  compressor of some kind.  And maybe a -- some kind

Page 23

1  of tool bag.
2  Q.  That's what he told you over the phone?
3  A.  Correct.
4  Q.  All right.  What did you tell him in that
5  phone call?
6  A.  I would take this information and present
7  it to the magistrate.
8  Q.  So after you got the phone call, what did
9  you do?
10  A.  I typed out a search warrant.  I took a
11  search warrant to the magistrate and presented it to
12  the magistrate.
13  Q.  All right.  I'm going to show you what's
14  marked as Plaintiff's Exhibit B.
15      I ask you:  Is this the search warrant that
16  you typed up and submitted to the magistrate?
17  A.  It is.
18  Q.  Okay.  And on the front of the search
19  warrant, it says that it was prepared at 4:52.  Does
20  that sound right to you?
21  A.  Yes, sir.
22  Q.  When you went to the magistrate's office,
23  where was the magistrate physically located, do you
24  remember?
25  A.  In his office.

Page 24

1  Q.  Where is that?
2  A.  The Laurens County Courthouse.
3  Q.  Okay.  And when you went to the magistrate
4  and you presented him the warrant, what happened?
5  A.  He found that probable cause existed for a
6  search of the property, and he signed the search
7  warrant.
8  Q.  Do you recall him having any questions for
9  you?
10  A.  I don't recall any particular questions he
11  had, no.
12  Q.  Here on the second page, it looks like that
13  he wrote that he signed it at about 5:05 p.m.  Does
14  that sound right to you?
15  A.  Yes.
16  Q.  Now, I'd like to direct your attention to
17  the description of the property that you typed up.
18  And I will ask you to read that first, to yourself.
19  A.  Out loud?
20  Q.  Just to yourself.
21  A.  Okay.
22  Q.  All right?
23  A.  All right.
24  Q.  You told me before that Mr. Moody, over the
25  phone, had told you that they were looking for a

Page 25

1  stolen air compressor and some other tools, is that
2  right?
3  A.  Other tools, correct.
4  Q.  And a bag, maybe?
5      Does that sound right?
6  A.  Correct.
7  Q.  Is there a reason why, in the description
8  of the property that you typed up, that you did not
9  write that it was an air compressor and a bag?
10  A.  At that time when he called me, he was
11  working in coordination with the Abbeville County
12  investigators.  And I -- like I said, he explained
13  to me that there were other items taken during that
14  theft.  I can't say for sure that he specifically
15  spelled out those particular items before I typed
16  the search warrant up.
17  Q.  Okay.  So if he had specified them, would
18  you have written them down, or would it just depend?
19  A.  Possibly.
20  Q.  What might it depend on?
21  A.  If he had given me a positive description
22  of each individual item, then, yes, I probably would
23  have written it down.  At this particular time, I
24  wrote down what information and what facts he gave
25  me.

Clark, Christine v
Bridges, Brian K., et al

Robert Wilkie
July 31, 2015

Page 38

1  house and needing to get a change of clothes?
2  A.  It seems like they may have, but I really
3  don't remember.
4  Q.  After you completed the search, what did
5  you do next?
6  A.  After the search was complete, I left.
7  Q.  So you didn't find any of the tools that
8  y'all were looking for?
9  A.  That would be a question that would need to
10 be directed towards the Abbeville County
11 investigators.
12 Q.  Do you recall taking any tools with you
13 when you left?
14 A.  Not that I recall, me, personally.
15 Q.  The lawnmower was the only item named in
16 the search warrant that y'all actually found on the
17 premises, is that right?
18     MR. HARTER:  Object to the form.
19     He can answer.
20 A.  I know that item was there.
21 Q.  You don't remember anything else that y'all
22 took besides the marijuana and these guns?
23 A.  I don't remember, no.
24 Q.  Okay.  Did you have a post-search
25 debriefing about the next steps in the investigation

Page 39

1  into these stolen tools?
2  A.  Not that I took part in.
3  Q.  At some point, were the charges against
4  Miss Clark, dismissed?
5  A.  It is my understanding that the charges
6  against her were nol prossed.
7  Q.  And when they were nol prossed, were you
8  contacted by anyone at the solicitor's office to get
9  your input on that, or did they just do that
10 themselves?
11 A.  No, I wasn't the arresting officer.
12 Q.  Would you have expected that the
13 solicitor's office would have contacted the
14 arresting officer before nol prossing charges?
15     MR. HARTER:  Object to the form.
16     You can answer.
17 A.  That's up to their discretion.
18 Q.  Is it their normal practice in Laurens
19 County?
20 A.  Sometimes they do, sometimes they don't.
21 Q.  Is it fair to say that you were the person
22 who was primarily responsible for determining which
23 drawers in the house got opened?
24 A.  I wouldn't say I was primarily responsible
25 for that.  I'm sure I opened some drawers and

Page 40

1  searched, though.
2  Q.  Was there anyone who was primarily
3  responsible for deciding where law enforcement
4  needed to look for these tools?
5  A.  I wouldn't say any one particular person
6  was responsible.  Everybody just worked together and
7  searched an area.
8  Q.  And so did y'all divide up the house, so
9  you take one room and somebody else took another
10 room?  How did it work?
11 A.  Yeah.  I mean, I would search a room.
12 Someone could possibly come behind me and search
13 again, just to cover the bases and make sure we
14 didn't miss anything.  The investigators were going
15 throughout the house, searching.
16 Q.  Who else do you recall opening up drawers
17 in the house?
18 A.  I can't name any one particular officer
19 that opened a drawer.  I'm sure officers opened
20 drawers, but I can't name one.
21 Q.  Do you remember Officer Moody searching for
22 other tools in the house?
23 A.  He was in the residence, searching, yes.
24 Q.  Do you remember Lieutenant Bridges
25 searching for the tools in the house?

Page 41

1  A.  Yes.
2  Q.  Do you remember Mr. Scott searching for
3  tools inside the house?
4  A.  I believe he was in the house, yes.
5  Q.  And he was in the house.  Was he searching
6  for tools?
7  A.  Yes.
8  Q.  Do you remember Mr. Abernathy searching for
9  tools inside the house?
10 A.  I believe he was.
11 Q.  Do you think that there was anything wrong
12 with the search warrant that you obtained?
13 A.  No.
14 Q.  Do you think that you should have done
15 anything differently for the search?
16 A.  No.
17 Q.  So as far as you're concerned, everything
18 that happened while you were there was by the book?
19 A.  Yes.
20     MR. HARTER:  I'll object to the form of the
21 question, but go ahead.
22 Q.  Do you recall Sergeant Moody taking any
23 pictures of Miss Clark?
24 A.  No.
25 Q.  Did anyone ever tell you that he had taken

Clark, Christine v  
Bridges, Brian K., et al

Robert Wilkie  
July 31, 2015

Page 42

```
1   pictures of Miss Clark?
2       A.  No.
3           MR. ANDERSON:  No further questions.
4                    EXAMINATION
5   BY MR. HARTER:
6       Q.  Robert, let me ask you about one thing.
7   We'll look at Exhibit B, which is the search
8   warrant.
9           Over on the section that is entitled
10  "Affidavit," do you see that?
11      A.  Yes.
12      Q.  You see there is a description.  It says:
13  Reasons for affiant's belief the property sought is
14  on the subject premises.
15          Do you see that?
16      A.  Yes.
17      Q.  And you provided this information to the
18  magistrate, is that correct --
19      A.  Yes.
20      Q.  -- to obtain the search warrant?
21      A.  Yes.
22      Q.  Is it the magistrate's prerogative and
23  decision as to whether or not to issue the search
24  warrant or not?
25      A.  Correct.
```

Page 43

```
1       Q.  A magistrate can ask you to change the
2   wording of the search warrant, tell you you can
3   search or you can't search, is that right?
4       A.  Correct.
5       Q.  The magistrate can tell you, yes, I'll
6   allow that search, or I won't allow that search,
7   right?
8       A.  Correct.
9       Q.  And this search warrant ultimately was
10  issued by a Laurens County magistrate, right?
11      A.  Yes, sir.
12      Q.  And there was a search warrant that was
13  issued by the magistrate before the residence at
14  Hilley Drive was searched, correct?
15      A.  Yes, sir.
16      Q.  And in the affidavit that you provided to
17  the magistrate, am I correct that the affidavit
18  spells out that law enforcement was on the premises
19  and discovered in plain view a mower which had been
20  stolen from Abbeville County?
21      A.  Yes.
22      Q.  And did the affidavit also say that there
23  were other items stolen from the incident location
24  when the mower was stolen in Abbeville County?
25      A.  Yes, sir.
```

Page 44

```
1       Q.  And did the search warrant also indicate
2   that it was believed that other items might be
3   located on or about the premises?
4       A.  Yes, sir.
5       Q.  And those other items were the items that
6   you referred to as tools, is that right, that
7   Abbeville County had reported stolen?
8       A.  Yes, sir.
9       Q.  Did those items include tools, as well as a
10  bag, as well as a D-ring?
11      A.  Yes, sir.
12      Q.  When the search of the Hilley Drive
13  residence was done, it was done pursuant to a search
14  warrant, correct?
15      A.  Correct.
16      Q.  And on behalf of the authorization of the
17  search by the judge, correct?
18      A.  Correct.
19      Q.  And with regard to that search, the items
20  that were being looked for would have been tools, a
21  bag, and/or a D-ring that was stolen in Abbeville,
22  correct?
23      A.  Correct.
24          MR. HARTER:  Thank you.
25          MR. ANDERSON:  One follow-up question.
```

Page 45

```
1                FURTHER EXAMINATION
2   BY MR. ANDERSON:
3       Q.  About how long did it take you to go from
4   the magistrate's office to Hilley Drive?
5       A.  I don't remember.
6       Q.  Do you think that it's, like, ten minutes
7   or 30 minutes?
8       A.  Probably closer to 20 to 30 minutes, maybe.
9   I'm just guessing.
10          MR. ANDERSON:  Thank you.
11          MR. HARTER:  Okay.
12          (The deposition concluded at 2:25 p.m.)
13          (The witness reserved his right to read and
14  sign the deposition.)
```