IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Christine Clark, | ) | Case No. 6:14-cv-04313-BHH-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Brian K. Bridges, Justin Moody, Robert R. | ) | |
| Wilkie, Ryan Abernathy, Brandon Scott, | ) | |
| Sheriff Ricky Chastain, Sheriff Ray | ) | |
| Watson,[1] | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on a motion for partial summary judgment filed by
Plaintiff [Doc. 32] and a motion for summary judgment filed by Defendants [Doc. 45].
Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(d),
D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under
42 U.S.C. § 1983 and to submit findings and recommendations to the District Court.

Plaintiff, proceeding with the assistance of counsel, filed this action on August 27,
2014, against Defendants Brian K. Bridges ("Bridges"), Justin Moody ("Moody"), Robert R.
Wilkie ("Wilkie"), Ryan Abernathy ("Abernathy"), Brandon Scott ("Scott"), and Kenneth Ray
Smith in the Court of Common Pleas for Laurens County, South Carolina, alleging
violations of his constitutional rights pursuant to 42 U.S.C. § 1983, a federal conspiracy
claim, a state civil conspiracy claim, and declaratory judgment. [Doc. 1-1.] On November
5, 2014, Defendants removed the action to this Court. [Doc. 1.] On May 11, 2015, with
leave of this Court, Plaintiff filed an Amended Complaint, adding Defendants Sheriff Ricky

---

[1] Defendant Kenneth Ray Smith was terminated pursuant to a stipulation of
dismissal filed on September 18, 2015. [Doc. 31.]

Chastain ("Chastain") and Sheriff Ray Watson ("Watson") and a Tort Claims Act claim against Chastain and Watson.  [Doc. 24.]

On September 18, 2015, Plaintiff filed a motion for partial summary judgment.  [Doc. 32.]  Defendants filed a response in opposition on October 26, 2015 [Doc. 41], and Plaintiff filed a reply on November 16, 2015 [Doc. 46].  Defendants filed a motion for summary judgment on November 16, 2015.  [Doc. 45.]  Plaintiff filed a response in opposition on December 3, 2015 [Doc. 48], and Defendants filed a reply on December 29, 2015 [Doc. 52].  Accordingly, the motions are ripe for review.

## BACKGROUND

**Initial Investigation Into Stolen Property on Jacqueline Drive**

In August 2011, an informant contacted Abernathy, who was a Narcotics Investigator with the Abbeville County Sheriff's Office at the time, to report that two individuals had stolen some property, including a four-wheeler, a walk-behind mower, and miscellaneous tools, and where they had taken the property.  [Doc. 41-2 at 2:13–3:2, 4:4–22.]  After reporting this information to his supervisor and contacting the Laurens County Sheriff's Office, Abernathy met Scott, Mike Belcher, Moody, and Bridges at a church and then proceeded to a residence on Jacqueline Drive.[2]  [*Id.* at 4:23–5:24.]  After arriving at the residence on Jacqueline Drive, the officers located Andy Smith ("Smith") on the stolen four-

---

[2]Scott was with the Abbeville County Sheriff's Office at the time [Doc. 41-7 at 3:14–16]; Mike Belcher is not a defendant in this action; Moody was with the Laurens County Sheriff's Office [Doc. 32-10 at 2]; and Bridges was with the Laurens County Sheriff's Office [Doc. 32-8 at 2].  The Abbeville County officers coordinated with Laurens County officers to obtain possession of property that had been stolen in Abbeville County and brought into Laurens County.  [Doc. 41-7 at 3:19–23.]

2

wheeler and arrested him based on felony warrants. [*Id.* at 5:25–6:13.] Smith told the officers that Buddy Patton ("Patton") had the mower up the road. [*Id.* at 6:14–22.]

**Investigation Continues on Hilley Drive**

The officers left the residence on Jacqueline Drive and went to the residence on Hilley Drive where Smith said the mower would be. [*Id.* at 7:7–15.] When the officers arrived at the residence on Hilley Drive, they noticed the mower sitting in the yard. [Doc. 41-4 at 5:3–8; Doc. 41-2 at 9:11–13.] Some officers went to the front door and knocked on the door for several minutes while Abernathy, Bridges, and Moody walked around to the rear of the residence. [Doc. 41-4 at 5:8–12.] No one answered the front door, and Abernathy walked over to the mower and determined it was the stolen mower. [Doc. 41-2 at 9:14–10:12.]

Bridges then knocked on the back door, and no one responded. [Doc. 41-4 at 8:8–16.] Bridges continued walking around the residence and came upon what looked like doors made of ply board on a barn or shop. [*Id.* at 8:18–22.] The doors were open, and he could not tell whether it was part of the residence. [*Id.* at 8:22–24.] Inside the building were chairs, furniture, and a washer and dryer. [*Id.* at 12:20–23.]

**Plaintiff's Arrest**

Bridges testified at his deposition that as he was looking around this barn or shop, Plaintiff exited a door on the far right from his location.[3] [*Id.* at 8:24–9:7.] After she exited the door, Bridges yelled, "Hey, Sheriff's office. Sheriff's office," to let her know the officers

---

[3]Plaintiff lives at the residence on Hilley Drive, which used to be a shop but has been renovated and turned into a house. [Doc. 41-5 at 2:1–12.] Patton was living with Plaintiff at the time. [Doc. 41-4 at 3:3–10.]

were there.  [*Id.* at 15:1–10.]  Plaintiff then came to Bridges while other officers also came

to Bridges after realizing contact was being made.  [*Id.* at 15:11–15; *see also* Doc. 41-2 at

14 ("At that time, [Plaintiff] had exited the residence.  And we just all kind of gathered up

at her location.").]

Once Plaintiff was outside with the officers, Moody advised her why the officers were

there, gave her *Miranda* warnings, and asked her some questions.  [Doc. 41-3 at 6:18–8:6.]

Plaintiff's answers to the officers' questions were evasive [Doc. 41-4 at 16:21–17:6], but

she told the officers that Patton had brought the lawn mower to her property, and she knew

it was there [Doc. 41-3 at 8:3–6].  Plaintiff was placed under arrest for receiving stolen

goods.  [*Id.* at 8:19–25.]  When Moody placed Plaintiff under arrest, Plaintiff was

approximately five or six feet away from her back door in her backyard.  [Doc. 32-8 at 8.]

Plaintiff testified to a different series of events at her deposition.  According to

Plaintiff, her residence includes a large room, which she calls the laundry room, that had

at the time a shower, a hot water heater, a washing machine and dryer, a table, and two

chairs.  [Doc. 32-9 at 3–4.]  A double door opens in from the outside of the residence into

the laundry room.  [*Id.* at 3.]  Plaintiff went to the laundry room to take a shower.  [*Id.* at 5.]

She walked through the door to the laundry room, which was dark, kicked off her pants,

and the next thing she knew, she was on the ground and outside.  [*Id.*]

After Plaintiff was arrested, the officers placed her in a chair while they waited on

transport.  [Doc. 41-4 at 21:1–5.]  Bridges walked away to look at some cars and, as he

walked back by Plaintiff, while she was in handcuffs, she attempted to stand up and say

she was leaving.  [*Id.* at 22:1–11.]  Bridges placed his hand on her shoulder and said, "No,

you are going to sit right there and wait on the transport."  [*Id.* at 22:12–14.]  Plaintiff jerked

4

back and started saying, "Don't beat me, don't beat me." [*Id.* at 22:16–18.] Bridges walked away and asked Moody to take some photographs of Plaintiff because when she started making comments like that, he wanted to make sure they had photographs to show that nothing had happened to her.[4] [*Id.* at 22:19–25; *see also* Doc. 41-3 at 15:15–18:3.]

**Officers Obtain a Search Warrant**

After Plaintiff was arrested, Moody called Wilkie to relay information for Wilkie to present to a magistrate to get a search warrant for the residence. [Doc. 41-6 at 2:21–3:1.] Moody told Wilkie that he had received information that a stolen mower was located at the Hilley Drive address, that Moody and other officers went to that location, and that, while walking around to the rear of the residence in an attempt to locate someone at home, they saw the mower in plain view at the residence. [*Id.* at 4:4–14.] Moody wanted Wilkie to present the information to a magistrate to get a search warrant for the residence because they understood that other items had been stolen in addition to the mower. [*Id.* at 4:15–20.] Wilkie typed out a search warrant and presented it to the magistrate. [*Id.* at 5:8–12.] The magistrate determined that probable cause existed to search the property and signed the search warrant. [*Id.* at 6:3–7; Doc. 41-10.] The search warrant included the following description of the property to be searched for and seized: "Stolen property which was taken during the theft of the listed orange in color all terrain mower from Abbeville County." [Doc. 41-10 at 3.]

---

[4]The photographs were taken on Moody's Laurens County Sheriff's Office cell phone. [Doc. 32-14.] The photographs were never transferred and/or downloaded to the file and, upon Moody's departure from employment with the Laurens County Sheriff's Office, his cell phone was cleared for re-use and any photographs were erased and/or deleted. [*Id.*]

5

**Officers Conduct a Search**

After the magistrate issued the search warrant, Wilkie took it to the residence on Hilley Drive, and the officers conducted a search.  [Doc. 41-6 at 7:1–24.]  During the search, Defendants found and seized guns and marijuana in addition to the mower, which the victim took.[5]  [Doc. 41-3 at 23:19–26:5.]  The guns were seized because Patton was a convicted felon and could not have the weapons.  [*Id.* at 24:14–17.]

**Arrest Warrant and Charges Against Plaintiff**

The following day, Moody obtained two arrest warrants for Plaintiff—one for receiving stolen goods, value more than $2,000 but less than $10,000, and one for possessing one ounce or less of marijuana.  [Doc. 32-6.]  The charges against Plaintiff were nol prossed after Patton pled guilty.[6]  [Doc. 41-3 at 33:10–15.]

## <u>APPLICABLE LAW</u>

**Requirements for a Cause of Action Under § 1983**

This action is filed pursuant to 42 U.S.C. § 1983, which provides a private cause of action for constitutional violations by persons acting under color of state law.  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  Accordingly, a civil action under § 1983

---

[5]The only item listed as seized on the search warrant return is the mower.  [Doc. 32-5 at 4.]

[6]While officers were conducting the search, Patton came to the location.  [Doc. 41-3 at 21:11–16.]  Moody gave Patton his *Miranda* warnings, and Patton stated that he had gotten the mower from somebody, that he lived at Hilley Drive, and that he had used the mower.  [*Id.* at 21:19–24.]  Patton was arrested for receiving stolen goods.  [*Id.* at 22:2–8.]

6

allows "a party who has been deprived of a federal right under the color of state law to seek

relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

Section 1983 provides, in relevant part,

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State . . . subjects, or
> causes to be subjected, any citizen of the United States or any
> person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured in an action at law,
> suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.  To establish a claim under § 1983, a plaintiff must prove two elements:

(1) that the defendant "deprived [the plaintiff] of a right secured by the Constitution and laws

of the United States" and (2) that the defendant "deprived [the plaintiff] of this constitutional

right under color of [State] statute, ordinance, regulation, custom, or usage."  *Mentavlos v.

Anderson*, 249 F.3d 301, 310 (4th Cir. 2001) (third alteration in original) (citation and

internal quotation marks omitted).

The under-color-of-state-law element, which is equivalent to the "state action"

requirement under the Fourteenth Amendment,

> reflects judicial recognition of the fact that most rights secured
> by the Constitution are protected only against infringement by
> governments.  This fundamental limitation on the scope of
> constitutional guarantees preserves an area of individual
> freedom by limiting the reach of federal law and avoids
> imposing on the State, its agencies or officials, responsibility
> for conduct for which they cannot fairly be blamed.

*Id.* (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 658

(4th Cir. 1998)) (internal citations and quotation marks omitted).  Nevertheless, "the deed

of an ostensibly private organization or individual" may at times be treated "as if a State has

caused it to be performed."  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531

7

U.S. 288, 295 (2001).  Specifically, "state action may be found if, though only if, there is

such a 'close nexus between the State and the challenged action' that seemingly private

behavior 'may be fairly treated as that of the State itself.'"  *Id.* (quoting *Jackson v. Metro.

Edison Co.*, 419 U.S. 345, 351 (1974)).  State action requires both an alleged constitutional

deprivation "caused by the exercise of some right or privilege created by the State or by a

rule of conduct imposed by the State . . . or by a person for whom the State is responsible"

and that "the party charged with the deprivation [is] a person who may fairly be said to be

a state actor."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).  A determination

of whether a private party's allegedly unconstitutional conduct is fairly attributable to the

State requires the court to "begin[ ] by identifying 'the specific conduct of which the plaintiff

complains.'"  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999) (quoting *Blum* v.

*Yaretsky*, 457 U.S. 991, 1004 (1982)).

**Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved

for summary judgment:

> The court shall grant summary judgment if the movant shows
> that there is no genuine dispute as to any material fact and the
> movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would

affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such

that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  When

determining whether a genuine issue has been raised, the court must construe all

8

inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

In her Amended Complaint, Plaintiff alleges five causes of action: a violation of 42 U.S.C. § 1983; conspiracy to violate 42 U.S.C. § 1983; state civil conspiracy; declaratory judgment; and a violation of the South Carolina Tort Claims Act.  [Doc. 24.]  In her motion for partial summary judgment, Plaintiff alleges she is entitled to summary judgment on the following specific issues: unconstitutional arrest; unconstitutional pre-warrant search; unconstitutional post-warrant search; and unconstitutional seizure of guns.[7]  [Doc. 32.]  In their motion for summary judgment, Defendants allege they are entitled to summary judgment on all Plaintiff's claims.  [Doc. 41.]

**Defendants Abernathy and Scott**

In their motion for summary judgment, Defendants argue Abernathy and Scott are entitled to summary judgment because they were employed by the Abbeville County Sheriff's Office and had no jurisdiction in Laurens County and no involvement with Plaintiff's

---

[7]In her motion for partial summary judgment, Plaintiff also addresses her allegations regarding the unlawful destruction of photographs. [Doc. 32-1 at 13–14.] However, Plaintiff has clarified that she is seeking a jury instruction with respect to the destruction of photographs and is not raising a separate claim based on this allegation. [*Id.* at 14; Docs. 46 at 6; 48 at 8 n.5.] Requests regarding jury instructions are premature at this procedural posture.

actual arrest and/or seizure. [Doc. 45-1 at 23.] Defendants further argue Abernathy and Scott were there merely to identify the stolen property and observe the search and/or seizure of the stolen property. [*Id.*] Notably, Defendants have failed to direct the Court to any legal authority to support this position. Moreover, the Court finds that Abernathy and Scott's participation in the search and seizure is sufficient evidence upon which a reasonable juror could conclude that they were personally involved, even if indirectly. *See Dockery v. Tucker*, No. 97-CV-3584(ARR), 2006 WL 5893295, at *14 (E.D.N.Y. Sept. 6, 2006) (holding an FBI agent was not entitled to summary judgment for lack of personal involvement in a search because his participation in a task force and descriptions at trial of the acts at the scene were sufficient evidence upon which a reasonable juror could conclude the agent was personally involved, even if indirectly, in the search). Accordingly, Defendants Abernathy and Scott are not entitled to summary judgment for lack of personal involvement.

**Section 1983 Claims**

### *Fourth Amendment Claims*[8]

<u>Warrantless Arrest of Plaintiff</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or

---

[8]Although the Amended Complaint alleges violations of Plaintiff's Fourth, Eighth, and Fourteenth Amendment rights, as discussed herein, Plaintiff alleges violations of her Fourth Amendment rights.

is being committed." *Davenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citations omitted). And "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* (citing *Md. v. Pringle*, 540 U.S. 366, 371 (2003)); *see also Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009) ("[P]robable cause exists 'where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'") (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

A warrantless arrest inside a suspect's home require a different analysis because law enforcement officers are prohibited from entering a suspect's home without consent or a warrant. *Payton v. New York*, 445 U.S. 573 (1980). However, a warrantless arrest in a suspect's home is permissible if probable cause and exigent circumstances are present. *Id.* at 590. The Supreme Court has recognized a variety of specific circumstances that may constitute an exigency sufficient to justify the warrantless entry of private property. These circumstances have included when officers must enter to fight an on-going fire, prevent the destruction of evidence, or continue in "hot pursuit" of a fleeing suspect. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Mich. v. Tyler*, 436 U.S. 499, 509 (1978); *Ker v. Cal.*, 374 U.S. 23, 40 (1963); *United States v. Santana*, 427 U.S. 38, 42, 43 (1976)). Additionally, the Supreme Court and the Fourth Circuit Court of Appeals have held that more general "emergencies," if enveloped by a sufficient level of urgency, may also constitute an exigency and justify a warrantless entry. *See generally, Brigham City*, 547 U.S. at 403; *United States v. Hill*, 649 F.3d 258, 265 (4th Cir. 2011).

Here, it is undisputed that Plaintiff was arrested without an arrest warrant. However, a genuine issue of material fact exists with respect to the circumstances of Plaintiff's arrest. Defendants' version of the arrest is that Plaintiff exited the residence, Bridges yelled to let her know the officers were there, and then Plaintiff walked over to Bridges while other officers also walked to Bridges.    [Doc. 41-4 at 8:24–9:7, 15:1–15.]    Plaintiff was subsequently arrested after she was given *Miranda* warnings and after she answered the officers' questions about the mower.  [Doc. 41-3 at 6:18–8:6.]  Under this version of the arrest, Defendants would have to establish only that they had probable cause to believe that a criminal offense—receiving stolen goods—had been or was being committed by Plaintiff.  *See Davenpeck*, 543 U.S. at 152.  However, Plaintiff's version of the arrest is that she was grabbed while in the laundry room and pulled outside by Bridges.  [Doc. 48-4 at 4.]  Under this version of the arrest, Bridges entered into Plaintiff's residence to carry out the arrest; therefore, Defendants would have to establish both that probable cause and exigent circumstances were present.  *See Payton*, 445 U.S. at 590.  The factual dispute in this case affects the standard under which the Court must analyze Plaintiff's arrest.[9] Because this matter must await determination of the facts now in conflict, qualified immunity as set forth in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), and its progeny is inappropriate as well.  Accordingly, the Court recommends that both motions for summary

---

[9]Although Plaintiff relies on *Rogers v. Pendleton, 249* F.3d 279, 287 (4th Cir. 2001), to argue that Defendants would have to establish exigent circumstances even if she was arrested steps away from her back door [Doc. 32-1 at 8], the *Rogers* court addressed a warrantless search of the curtilage and not an arrest occurring on the curtilage.  A warrantless search of the curtilage is addressed below.

judgment be denied with respect to Plaintiff's Fourth Amendment claim that she was subjected to an unlawful warrantless arrest.[10]

<u>Pre-Warrant Search of the Curtilage</u>

"[T]he Fourth Amendment protects the curtilage of a house and . . . the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself."[11] *United States v. Dunn*, 480 U.S. 294, 300 (1987) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). Ordinarily, no Fourth Amendment violation occurs when officers "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants." *Rogers v.*

---

[10]The Court finds that a genuine issue of material fact remains regarding probable cause because whether probable cause existed depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. Whether exigent circumstances existed for the warrantless entry into Plaintiff's residence is a closer call. Defendants assert only one exigent circumstance existed—that the officers reasonably believed contraband or other evidence would be destroyed or removed. [Docs. 41-1 at 13–15; 45-1 at 11–12; 52 at 2–3.] However, as Plaintiff points out, Defendants have failed to direct the Court to any evidence that any officer actually had those concerns. Moreover, the Fourth Circuit Court of Appeals has considered the following factors when determining whether exigent circumstances are present:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

*United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981) (citing *United States v. Rubin*, 474 F.2d 262, 268–59 (3d Cir. 1973)). Defendants have failed to provide evidence to establish that exigent circumstances existed in this case under these factors.

[11]Defendants do not contend that the areas they searched were outside the boundaries of the curtilage.

*Pendleton*, 249 F.3d 279, 289 (4th Cir. 2001). Moreover, under appropriate circumstances, officers may circle to the back of the home. *Alvarez v. Montgomery Cty.*, 147 F.3d 354, 358 (4th Cir. 1998) (finding it reasonable for officers responding to a 911 call complaining of an underage drinking party to enter a homeowner's backyard when "circumstances indicated they might find the homeowner there" where a sign affixed to a lamppost in the front driveway read, "Party In Back," and included an arrow pointing toward the backyard). "The police may not, however, conduct a full search of the curtilage without a warrant or another justification that would be sufficient for entry into the home itself." *Edens v. Kennedy*, 112 F. App'x 870, 874 (4th Cir. 2004) (citing *Rogers*, 249 F.3d at 287, 289).

Here, Defendants contend their entry into the backyard was appropriate under *Alvarez* because they walked around back to locate and talk to an inhabitant. [Doc. 41-1 at 16.] However, several officers testified that when they arrived at the residence on Hilley Drive, some officers went to the front door and knocked while Abernathy, Bridges, and Moody walked around to the rear of the residence. [Docs. 32-11 at 3–4 (Q. What did you do when you arrived at the residence? A. Hilley Drive? Q. Yes. A. When we arrived at that residence, officers more or less -- you know, some officers go to the front door. I believe I went to the far right of the mobile home and kind of stood more or less at the back right corner. Other officers went to the back door."); 41-2 at 8:2–5 ("Q. So as soon as you got out of your vehicle you went and headed towards the back of the house, is that right? A. That's correct."); 41-4 at 5:3–12 (Q. So the four of you go over to Hilley Drive. And then what happens when you get to Hilley Drive? What's the first thing that you do? A. First thing I did, when I pulled up in the driveway, I noticed the mower sitting over in the back part of the yard. Two or three officers went to the front door and were knocking on the front

door for several minutes.  Nobody came to the door.  A couple of us walked around to the rear of the residence."]  Defendants have failed to direct the Court to any evidence to suggest there was reason to believe that knocking on a backdoor would produce a different result from knocking on the front door.  *See Pena v. Porter*, 316 F.App'x 303, 314 (4th Cir. 2009) (finding that when no one answered the front door, unlike in *Alvarez* or *Bradshaw*, there was no reason to expect that knocking on a back door would produce a different result).

Even if walking around the residence to knock on the back door did not violate the Fourth Amendment, Bridges testified at his deposition to two difference instances that exceed the purpose of walking around the house to knock on the back door.  After no one responded when Bridges knocked on the back door, he continued walking around the residence and came upon the previously mentioned doors.  [Doc. 41-4 at 8:18–22.]  He could not tell if this building was part of the residence, so he "just stood -- the doors were open.  I just stood in the door, kind of looking around, to see what kind of place this is or whatever."  [*Id.* at 8:24–9:1.]  Additionally, while waiting on the search warrant, Bridges walked around to look at old cars in the backyard to see if he could "tell anything was recognizable about them being, you know, stolen or anything."  [*Id.* at 22:1–7.]  Thus, even if the officers did not violate the Fourth Amendment when they walked around the residence to knock on the back door, "the right to knock and talk does not entail a right to conduct a general investigation of a home's curtilage."  *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 193 (4th Cir. 2015) (citing *Rogers*, 249 F.3d at 289).  To conduct a search of the curtilage, probable cause plus either a warrant or exigent circumstances must have been present.  *See Pena*, 316 F. App'x at 313–16.  Applying the *Turner* factors to determine whether

16

exigent circumstances were present, the Court finds it would not have been reasonable for Defendants to believe exigent circumstances existed where the contraband was a mower in plain view on the property, no evidence exists to support the possibility of danger to the officers guarding the site, and the mower would not have been readily destructible. Accordingly, because no factual dispute exists regarding the search of the curtilage, Plaintiff's motion for partial summary judgment should be granted with respect to this claim unless Defendants can establish they are entitled to qualified immunity.

Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Thus, qualified immunity does not protect an official who violates a constitutional or statutory right of a plaintiff that was clearly established at the time of the alleged violation such that an objectively reasonable official in the official's position would have known of the right. *Id.* Further, qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To determine whether qualified immunity applies, a court must determine "'whether the plaintiff has alleged the deprivation of an actual constitutional right at all[ ] and . . . whether that right was clearly established at the time of the alleged violation.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citing *Harlow*, 457 U.S.

17

at 819).  For purposes of this analysis, a right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* at 640.

Here, the Court has determined that Plaintiff's Fourth Amendment right to be free from unreasonable searches was violated when Defendants searched the curtilage of her property.  The Court additionally finds that Plaintiff's Fourth Amendment right to be free from unreasonable searches was clearly established.  *See Pena*, 316 F. App'x at 316 (affirming the district court's denial of qualified immunity and noting that the "decisions in both *Rogers* and *Alvarez* [made] plain that the curtilage of a home is afforded the same Fourth Amendment protection as the home itself").  Accordingly, Plaintiff's motion for partial summary judgment should be granted with respect to her claim that her Fourth Amendment rights were violated when Defendants searched the curtilage of her home, and Defendants' motion for summary judgment should be denied with respect to this claim.

<u>Post-Warrant Search of the Home and Seizure of Guns in the Home</u>

The Fourth Amendment provides that warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  This particularity requirement is meant to ensure that citizens are not subjected to "a general, exploratory rummaging in [their] belongings," *Coolidge v. N.H.*, 403 U.S. 443, 467 (1971), and that nothing is left "to the discretion of the officer executing the warrant," *United States v. Robinson*, 275 F.3d 371, 381 (4th Cir. 2001) (citing *Marron v. United States*, 275 U.S. 192 (1927)).  "'The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved . . . (T)here is a practical margin of flexibility permitted by the constitutional requirement for

18

particularity in the description of items to be seized.'"  *United States v. Torch*, 609 F.2d

1088, 1090 (4th Cir. 1979) (quoting *United States v. Davis*, 542 F.2d 743, 745 (8th Cir.

1976) (alterations in original)).  Additionally, in assessing the specificity of a warrant, all

parts should be read together.  *United States v. Weston*, 962 F.2d 8, at *5 (4th Cir.  Apr.

30, 1992) (unpublished table decision).

Here, the description of the property on the search warrant reads, "Stolen property

which was taken during the theft of the listed orange in color all terrain mower from

Abbeville County."  [Doc. 41-10 at 3.]  As the Eighth Circuit Court of Appeals has held, such

a description "is not descriptive at all.  It is simply conclusory language."  *See United States*

*v. LeBron*, 729 F.2d 533, 537 (8th Cir. 1984) (holding that the clauses "any records which

would document illegal transactions involving stolen property" and "any other property,

description unknown, for which there exists probable cause to believe it to be stolen" were

not specific enough to sufficiently provide any guidance to an executing officer).  The only

item specifically mentioned in the search warrant is the mower, which had already been

seen by the officers in plain view outside of the residence.  Additionally, the affidavit

attached to the search warrant contains the same general description of the property

sought and, for the reason to believe the property is at the premises to be searched, merely

states that other items were stolen when the mower was stolen, but does not provide any

more specific description of the property.  [Doc. 41-10 at 4.]  Thus, the search inside the

residence was pursuant to a facially invalid warrant.

When a search and seizure is "based upon an invalid warrant", it "is the same as a

warrantless search and is also unconstitutional."  *Truelove v. Hunt*, 67 F.Supp.2d 569, 577

(D.S.C. 1999) (citing *United States v. Leon*, 468 U.S. 897 (1984).  "It is a 'basic principle

of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586. Thus, the search of Plaintiff's residence and seizure of property[12] inside the residence violated Plaintiff's Fourth Amendment rights. Because no factual dispute exists regarding the validity of the warrant, Plaintiff's motion for partial summary judgment should be granted with respect to this claim unless Defendants can establish they are entitled to qualified immunity.

"Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with the requirement was valid." *Groh v. Ramirez*, 540 U.S. 551, 554 (2004); *see also Leon*, 468 U.S. at 923 ("[D]epending on the circumstances of the particular case a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."). Accordingly, Plaintiff's motion for partial summary judgment should be granted with respect to her claim that her Fourth Amendment rights were violated when Defendants searched inside her residence and seized items pursuant to a facially invalid warrant, and Defendants' motion for summary judgment should be denied with respect to this claim.

### Use of Force During Arrest

A claim that "law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490

---

[12]As stated, during the search inside the home, Defendants found and seized guns and marijuana. [Doc. 41-3 at 23:19–26:5.] Plaintiff denies that she had any marijuana to be seized and is, therefore, not seeking to recover damages for its seizure. [Doc. 46 at 6.]

U.S. 386, 388 (1989).  In applying the objective reasonableness standard, "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force."  *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Graham*, 490 U.S. at 396–97).  Further, proper application of the objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight," and "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  Moreover, "[t]he Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm," *Elliott*, 99 F.3d at 641; thus, police officers do not have "to wait until a suspect shoots to confirm that a serious threat of harm exists," *id.* at 643.

Here, because, as stated, a genuine issue of material fact exists with respect to the circumstances of Plaintiff's arrest, Defendants are not entitled to summary judgment with respect to Plaintiff's excessive force claim.  Accepting Plaintiff's version of the facts as true, she was grabbed while in the laundry room and pulled outside by Bridges.  [Doc. 48-4 at 4.]  Plaintiff testified that she was forced down on the ground on her left hip and left arm and had bruises as a result.  [*Id.* at 9–10.]  Defendants deny Plaintiff was ever put on the ground and argue Plaintiff has evidence only of bruises she received when she sat down in a chair.  [Docs. 45-1 at 16; 52 at 4.]  However, Plaintiff testified that she got a bruise on her stomach when she "went down" and then got a bruise on her hip when the officers put her in a chair and the knobs of the chair hit her hip.  [Doc. 48-4 at 5.]  Thus, a factual

21

dispute exists about the circumstances of Plaintiff's arrest.  Because this matter must await determination of the facts now in conflict, qualified immunity as set forth in *Harlow*, 457 U.S. 800, and its progeny is inappropriate as well.  Accordingly, the Court recommends that Defendants' motion for summary judgment be denied with respect to Plaintiff's excessive force claim.

### *Conspiracy*

To allege a civil conspiracy under § 1983, a plaintiff is required to demonstrate that defendants acted jointly and some overt act was done in furtherance of the conspiracy, which denied the plaintiff his or her constitutional right.  *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996).  Establishing a civil rights conspiracy is a weighty burden.  *Id.*  Although a plaintiff need not produce direct evidence of a meeting of the minds, he or she must come forward with "specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective."  *Id.*

Here, Plaintiff argues Defendants agreed to work together and testified that they agreed to with the decisions made during the search [Doc. 48 at 7]; however, Plaintiff has failed to produce any evidence that would "reasonably lead to the inference that [Defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan."  *See id.*  Accordingly, Defendant's motion for summary judgment should be granted with respect to Plaintiff's § 1983 conspiracy claim.

## State Civil Conspiracy Claim

To be successful on a claim for civil conspiracy in South Carolina, the plaintiff must show (1) a combination of two or more persons; (2) for the purposes of injuring the plaintiff; (3) causing the plaintiff special damages.  *Vaught v. Waites*, 387 S.E.2d 91, 95 (S.C. Ct.

22

App. 1989) (citing *Lee v. Chesterfield Gen. Hosp. Inc.*, 344 S.E.2d 379 (S.C. Ct. App. 1986)). "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint." *Hackworth v. Greywood at Hammett, LLC*, 682 S.E.2d 871, 874 (S.C. 2009). Stated differently, the acts pled in furtherance of the conspiracy must be "separate and independent from other wrongful acts alleged in the complaint, and the failure to properly plead such acts will merit the dismissal of the claim." *Id.* at 875. "Moreover, because the quiddity of a civil conspiracy claim is the special damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other causes of action." *Id.* at 874. "If a plaintiff merely repeats the damages from another claim instead of specifically listing special damages as part of [her] civil conspiracy claim, the[] conspiracy claim should be dismissed." *Id.*

Here, Plaintiff has failed to identify concrete acts independent of any other alleged wrongdoing. Additionally, as with her federal conspiracy claim, Plaintiff has failed to allege Defendants joined together for the purpose of injuring Plaintiff. Finally, Plaintiff has not shown special damages as required for a civil conspiracy claim. The damages listed in her civil conspiracy claim are "physical and emotional injuries." [Doc. 24 ¶ 37.] As her general damages allegation in the Amended Complaint, Plaintiff also claims that "[a]s a result of the Defendants' outrageous actions, [Plaintiff] suffered physical injury in the form of bruises, pain and suffering, and emotional anguish." [*Id.* ¶ 28.] Therefore, Plaintiff has failed to allege special damages and has further failed to provide evidence of special damages. Accordingly, Defendants' motion for summary judgment should be granted with respect to Plaintiff's state civil conspiracy claim.

**South Carolina Tort Claims Act Claims**

23

Plaintiff brings her state law causes of action under the South Carolina Tort Claims Act ("SCTCA").  Under the SCTCA, "[a]n employee of a governmental entity who commits a tort while acting within the scope of his official duty is generally not liable, and the plaintiff must sue the governmental agency itself.  S.C. Code Ann. § 15–78–70(a).  However, if the plaintiff proves that "the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude," then the governmental agency is not liable, and the employee is personally liable.  S.C. Code Ann. § 15–78–70(b).  Here, Plaintiff alleges that the defendant officers were acting within the course and scope of their employment [Doc. 24 ¶¶ 45, 46] and brings her SCTCA claim against only Chastain and Watson as sheriffs [*id.* at 6].  Accordingly, the Court declines to address any arguments raised by the parties with respect to the defendant officers' liability under the SCTCA.

In their motion for summary judgment, with respect to Plaintiff's SCTCA cause of action, Defendants argue only that there is no evidence of any alleged deficiency in the policies, training, and/or supervision that would give rise to liability on the part of Sheriff Chastain and/or Sheriff Watson.  [Doc. 45-1 at 25–27.]  Plaintiff responded that she is not raising a claim regarding lack of training and, instead, addresses claims of conversion/trespass and false arrest/imprisonment.  [Doc. 48 at 8–10.]  In their reply, Defendants have devoted one or two sentences to each of these state law claims, unsupported by any legal authority.  [Doc. 52 at 7.]  Accordingly, Defendants' motion for

24

summary judgment should be denied with respect to Plaintiff's claims under the SCTCA.

## RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that Plaintiff's motion for partial summary judgment be GRANTED IN PART and DENIED IN PART and that Defendants' motion for summary judgment be GRANTED IN PART and DENIED IN PART. More specifically, the Court recommends that Plaintiff's motion for partial summary judgment be

(a) granted with respect to Plaintiff's claims

(1) that Defendants unlawfully searched the curtilage of her home and

(2) that Defendants unlawfully searched inside her residence and unlawfully seized property inside her residence and

(b) denied with respect to Plaintiff's claim that she was subjected to an unlawful warrantless arrest.

The Court recommends that Defendants' motion for summary judgment be

(a) granted with respect to Plaintiff's

(1) § 1983 conspiracy claim and

(2) state civil conspiracy claim and

(b) denied with respect to

(1) Defendants' argument that Abernathy and Scott are entitled to summary judgment for lack of personal involvement and

(2) Plaintiff's claims

(i) that she was subjected to an unlawful warrantless arrest,

(ii) that Defendants unlawfully searched the curtilage of her home,

(iii) that Defendants unlawfully searched inside her residence and unlawfully seized property inside her residence,

(iv) that Defendants used excessive force during Plaintiff's arrest, and

(v) that are raised under the South Carolina Tort Claims Act.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

July 28, 2016
Greenville, South Carolina